UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Trevis Thompson, *Plaintiff*, v. Wexford Health Sources Inc., *et al.*, *Defendants*. | No. 20 CV 1191<br><br>Judge Lindsay C. Jenkins |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Trevis Thompson filed this lawsuit in February 2020 and filed the operative Third Amended Complaint in December 2022. [Dkt. 142.] Count One arises under 42 U.S.C. § 1983 for excessive use of force in violation of the Eighth Amendment by Officer Thomas Kelley alone.[1] Count Two alleges Intentional Infliction of Emotional Distress (IIED) against Officer Kelley and all the remaining Defendants: Wexford Health Sources, Inc.; Dr. Saleh Obaisi; Dr. Christian Okezie; Dr. Marlene Henze; LaTanya Williams; Lt. Shantell Scott; Sgt. Kara Pronger.[2] The Defendants have moved for Summary Judgment. [Dkt, 184, 188.] For the reasons explained below, the Wexford Defendants' motion is granted and the IDOC Defendants' motion is granted in part and denied in part. The claims pending against Officer Kelley remain for trial.

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

[2] Thompson's filings and the case caption often spell Sgt. Progner's last name as "Pranger." [Dkt. 142 at 1.] The Court uses the spelling provided by Sgt. Pronger in her deposition. [Dkt. 189-9 at 4:9.]

1

I.   **Factual Background**[3]

Thompson was incarcerated at Stateville Correctional Center, where Wexford provided health services to inmates. [Dkt. 198 at ¶¶2, 11.] Dr. Obaisi was Stateville's Medical Director from August 2012 until his death in December 2017. [*Id.* at ¶ 7.] Dr. Okezie was the Stateville Medical Director until October 2018, when Dr. Henze became the Medical Director. [*Id.* at ¶¶ 8, 9.] Throughout Thompson's time at Stateville, Williams worked as a Physician's Assistant (PA). [*Id.* at ¶ 10.]

When Thompson saw Williams in 2011, he reported pain in his groin. [*Id.* at ¶ 17.] He continued to report rashes and pain in his groin throughout the next few years. [*Id.* at ¶¶ 18–19.] The parties identify Thompson's first complaint of right hip pain as occurring in a consultation with a nonparty doctor at Stateville in 2016. [*Id.* at ¶ 23.] When Thompson discussed this hip pain with Dr. Obaisi in February 2017, Dr. Obaisi performed a steroid injection to decrease inflammation and pain. [*Id.* at ¶ 25.] Thompson complained of continuing hip pain during a visit with Williams in March, and she recommended that he see the Medical Director. [*Id.* at ¶¶ 26–27.] When Thompson next saw Dr. Obaisi, his complaints centered on testicular pain, and Dr. Obaisi recommended referring him out for treatment. [*Id.* at ¶¶ 28–29.] In July 2018, Thompson told Williams about continuing pain in his hip. [*Id.* at ¶ 30.] Thompson later received an x-ray of his right hip. [*Id.* at ¶ 31.]

In August 2018, Dr. Okezie saw Thompson for the first time and noted that he had complained of pain in his right hip and groin. [*Id.* at ¶ 32.] Results from the most

---

[3]  The Court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed unless otherwise noted.

recent x-ray had not arrived, but Dr. Okezie noted that Thompson's right hip x-ray from 2016 appeared normal. [*Id.*] Dr. Okezie saw Thompson for the second and last time a few weeks later. [*Id.* at ¶ 33.] Despite an absence of bone or joint pathology, Dr. Okezie referred Thompson to UIC orthopedics for a consultation "given the length of the complaints for right hip pain." [*Id.*]

Thompson saw Dr. Henze for the first time in October 2018. [*Id.* at ¶ 35.] For further evaluation of his groin and hip pain, Thompson received an MRI at UIC in November 2018, which showed a "Cam-type deformity on the right femoral head/neck junction." [*Id.* at ¶¶ 35–36.] Thompson saw Dr. Henze again in January 2019 for a follow-up visit after a December UIC orthopedic appointment. [*Id.* at ¶ 38.] In response to Thompson's continued pain and newly reported shoulder pain, Dr. Henze prescribed Thompson a low bunk permit and a waist chain. [*Id.*]

After Thompson received his prescription for a low bunk permit, he was moved to Gallery 10, the top tier. [Dkt. 216 at ¶ 17.] Thompson states that he spoke to Officers Scott and Pronger about his desire to remain in a lower gallery because of his medical condition, but this fact is disputed. Thompson maintains that the two officers responded with threats to move him out of the cell house. [Dkt. 199 at ¶ 10.] Officers Scott and Pronger dispute this, claiming they cannot recall talking to Thompson at all, and they deny making any threats. [Dkt. 199 at ¶ 16; Dkt. 216 at ¶ 17.] It is undisputed that Officers Scott and Pronger were not involved in providing medical care to inmates, and they did not have the power to prescribe gallery or bunk

3

permits. [Dkt. 199 at ¶¶ 13, 19, 20.] It is also undisputed that the Officers had no discretion over gallery, cell, or bunk assignments at Stateville. [*Id.* at ¶ 20.]

By April 2019, Thompson's pain had not gone away, and Dr. Henze prescribed additional medication and a permit for Thompson to have an egg crate mattress on his bunk. [Dkt. 198 ¶ 40.] When Thompson told Williams that his pain medication was not helping, she switched his prescription. [*Id.* at ¶ 44.] After a consultation with UIC orthopedics during which UIC recommended surgery for Thompson's right hip, Dr. Henze met with Thompson and prescribed post-surgery physical therapy, an MRI, a low bunk permit, low gallery permit, and renewed pain medication. [*Id.* at ¶ 46.]

Some key events related to Officer Kelley came next. On November 12, 2019, before heading back to Stateville from an appointment with UIC orthopedics, Officer Kelley went to the inmate holding area of UIC to unlock Thompson's restraints to assist Thompson with going to the bathroom. [Dkt. 199 at ¶ 31.] The parties dispute what happened next. Kelley claims that as he was unlocking Thompson's restraints, Thompson quickly stood up, causing "his leg iron to become caught on an unsecured handcuff, causing Plaintiff to fall forward." [*Id.*] Thompson maintains Officer Kelley pulled his arm "while he was still cuffed to the floor which made Plaintiff fall face first." [Dkt. 216 at ¶ 30.] Thompson maintains he suffered injuries to his face, shoulder, hand, and back as a result of the fall. [Dkt. 199 at ¶ 23.]

Thompson received femoral acetabular surgery on his right hip on January 10, 2020, at UIC Orthopedics. [Dkt. 198 at ¶ 48.] Dr. Henze saw him for a follow-up two weeks later and ordered nursing staff to help him bathe because of his continued pain

4

and difficulty bathing. [*Id.* at ¶ 49.] After Thompson's surgery, Dr. Henze called Thompson's mother to provide an update on how Thompson was doing. [*Id.* at ¶ 50.]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (internal quotation omitted). The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted). But the nonmovant must offer evidence, not mere speculation, to defeat summary judgment. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021).

**III. Analysis**

    **A.    IDOC Defendants**

        **1.    Sovereign Immunity**

All three individual IDOC Defendants, Officers Kelley, Scott and Pronger, argue they are shielded from liability under the doctrine of sovereign immunity because at all relevant times they acted as agents of the state of Illinois. The State Lawsuit Immunity Act prohibits plaintiffs from suing the state with certain exceptions. 745 ILCS 5/1; see *Murphy v. Smith*, 844 F.3d 653, 658 (7th Cir. 2016), *aff'd*, 138 S. Ct. 784 (2018). Although the claims against the IDOC Defendants are in their individual capacities, the suit may still be considered a suit against the state itself if three conditions are met: there are no allegations that a state employee acted beyond the scope of his authority through wrongful acts; if the duty alleged to have been breached was not owed to the public generally independent of the fact of state employment; and if the complained-of actions involve matters ordinarily within that employee's normal and official functions of the state. *Murphy*, 844 F.3d at 658 (quoting *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990)).

Sovereign immunity does not apply, however, if a plaintiff alleges that state officials or employees violated "statutory or constitutional law" or acted in excess of their authority. *Murphy*, 844 F.2d at 658–59 ("If the plaintiff alleges that state officials or employees violated statutory or constitutional law, sovereign immunity affords no protection.") (cleaned up); *Richman v. Sheahan*, 270 F.3d 430, 441–42 (7th Cir. 2001). Similarly, when a state law claim depends on constitutional violations,

6

sovereign immunity does not apply. *Healy*, 549 N.E.2d at 1247; *Wheeler v. Piazza*, 364 F.Supp.3d 870, 885–86 (N.D. Ill. 2019).

Here, both of Thompson's claims against Officer Kelley arise out of the November 12 incident. Thompson alleges the fall amounted to excessive use of force in violation of the Eighth Amendment and constituted IIED. Because Thompson alleges Kelley's conduct was unconstitutional, sovereign immunity does not shield him from liability.

Thompson's claims against Officers Scott and Pronger, on the other hand, are barred by sovereign immunity. The Third Amended Complaint alleges only an IIED claim against Scott and Pronger based on their alleged attempts to deprive him "of access to adequate medical care." Thompson alleges these Officers "deliberately caused [him] to fear for his health and well being," resulting in excruciating pain and significantly limited mobility, among other issues. [Dkt. 142, ¶¶ 38, 39.]

But Thompson's IIED claim as articulated in the Third Amended Complaint does not allege that Officers Scott and Pronger's conduct amounted to a federal constitutional violation. [*Id*; Dkt. 190 at 6–7.] Thompson alleges only that he told Officers Scott and Pronger about his desire to remain in a lower gallery because of his medical condition, and that they responded with threats to move him out of the cell house. [Dkt. 142 at ¶ 27.] He does not allege that Scott or Pronger's conduct was somehow unconstitutional.

Thompson's argument to the contrary is unpersuasive. He suggests that his IIED claim should survive because Scott and Pronger's "extreme and outrageous

7

conduct" in the form "deliberate indifference to Plaintiff's medical needs" "implicates violations of the Eighth Amendment." [Dkt. 202 at 23–24.] But the Third Amended Complaint does not allege this; it alleges only that Scott and Pronger responded to his requests with threats. The case law Thompson cites only reiterates the conclusion that the sovereign immunity exception applies when a state law claim depends on a constitutional violation—which is not the case here. See *Jordan v. Bonano*, 636 F. Supp. 3d 924, 933–34 (N.D. Ill. 2022) (declining to dismiss an IIED claim on sovereign immunity grounds because that claim was grounded in an alleged Fourth Amendment violation); *Bernard v. Baldwin*, 2022 WL 847628, at *9 (N.D. Ill. March 22, 2022) (declining to dismiss an IIED claim against state defendants because that claim "stem[med] from the officers' use of excessive force (Count I)."); *Gay v. Ortman*, 2020 WL 5593283, at *3 (N.D. Ill. Sept. 18, 2020) ("sovereign immunity does not defeat Gay's battery and IIED claims . . . because the officers' challenged efforts to restrain Gay provide the factual basis for all of his claims, including his Eighth Amendment claim. Because Gay's state-law claims thus "depend[ ] on the alleged constitutional violation," sovereign immunity does not apply in this case.)

Nor does Thompson raise a factual dispute as to the scope of Scott or Progner's authority or official job functions such that the three criteria discussed above are not satisfied. Thompson's suit, therefore, is "nominally one" against Scott and Progner, but is actually against the State. *T.S. v. County of Cook*, 67 F.4th 884, 892 (7th Cir. 2023). As such, sovereign immunity shields Scott and Progner as agents of the state and sovereign immunity bars Thompson's claim against them.

8

### 2. Excessive Force--Officer Kelley

The Eighth Amendment's protection against cruel and unusual punishment prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). When prison officials are accused of using excessive physical force in violation of the Eighth Amendment, "the central question is 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Jones v. Anderson*, 116 F.4th 669, 677 (7th Cir. 2024) (quoting *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)); *see also Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012).

A "plaintiff must establish that prison officials acted wantonly; negligence or gross negligence is not enough." *Gomez*, 680 F.3d at 864 (citing *Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005)); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (violating the Eighth Amendment requires "a sufficiently culpable state of mind.") Inflicting unnecessary and wanton pain violates the Eighth Amendment, but *de minimis* uses of force do not. *Jones*, 116 F.4th at 677. Relevant factors include "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Id*. (quoting *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004)). To survive summary judgment, the plaintiff must have evidence that "will support a reliable inference of wantonness in the infliction of pain." *Fillmore*, 358 F.3d at 504 (quoting *Whitley*, 475 U.S. at 322).

Here, it is disputed what amount of force Officer Kelley used during the November 12 incident and whether that force was used maliciously. In his deposition,

9

Thompson testified that Officer Kelley was irritated with his responsibilities at UIC Hospital and the need to assist inmates with bathroom breaks; that he was "huffing and puffing" during the incident; and that he "let out his frustration on Plaintiff by pulling him and yanking him to the ground." [Dkt. 202 at 25–26; Dkt. 216, ¶31.] According to Thompson, Kelley caused the fall by pulling on Thompson's arm resulting in injuries to the face, shoulder, hand, and back. [Dkt. 202 at 26.] Thompson offers the affidavit of Cordell Williams, a fellow inmate who states Kelley "bent down as if to undo Thompson's shackles, but never did" and "pulled Thompson's arm and Thompson fell because he was still cuffed to the floor." [Dkt. 201-24 at 1.] Williams states this caused Thompson to "yell and moan in pain" after the fall. [*Id.*]

Conversely, Kelley maintains that the evidence does not support the conclusion that he intended to cause the fall. [Dkt. 217 at 5.] He cites to his deposition testimony that he was not annoyed with Thompson's request to use the bathroom and that he did not intend for Thompson to fall. [Dkt. 199, ¶32; Dkt. 216, ¶31.] Kelley attributes the fall to, at worst, "plain and simple negligence," explaining that he grabbed Thompson's arm but could not completely unlock the restraints before Thompson stood up. [Dkt. 189-11 at 26:11–18; 37:23–24; Dkt. 190 at 12–14.]

Whether Kelley's actions amounted to *de minimus* force as he claims, or whether the fall was due to wanton infliction of pain as Thompson claims, is a factual dispute for a jury to decide. Both parties rely on their respective deposition testimony in support of their dueling accounts of the incident, which amounts to a swearing contest that the Court may not resolve at the summary judgment stage. *Payne v.*

10

*Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting that the court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder . . . the court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." (cleaned up))[4] A reasonable factfinder could conclude that the force Kelley used was excessive. Or it could conclude that only a minimal amount of force was applied, so no violation occurred. Who to believe is for the jury to decide. Summary judgment is denied as to Count One.

### 3. IIED—Officer Kelley

To establish an IIED claim under Illinois law, a plaintiff must establish that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant knew there was a high probability that his actions would cause emotional distress; and (3) the conduct indeed caused severe emotional distress. *Swearnigen–El v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)).

Defendant Kelley contends that his conduct plainly fails to rise to the level of "extreme and outrageous" conduct that an IIED claim requires. The "extreme and outrageous" standard is a high bar. Conduct is extreme and outrageous where it is "so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Swearnigen–El*, 602 F.3d at 864. The factors

---

[4] Kelley's arguments notwithstanding, Thompson's reliance on his deposition testimony is an appropriate means of showing there is a material factual dispute. *Hill v. Tangherlini*, 724 F.3d 965, 967, n.1 (7th Cir. 2013).

11

courts should consider when evaluating whether conduct is extreme and outrageous include: (1) "the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme;" (2) "whether the defendant reasonably believed its objective was legitimate;" and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'" *Franciski v. Univ. of Chi. Hosp.*, 338 F.3d 765, 769 (7th Cir. 2003).

The same questions of fact that prevent summary judgment on the excessive force claim also prevent summary judgment as to Kelley on the IIED claim. If a jury finds that Kelley used an unreasonable amount of force, it could also find that he engaged in "extreme and outrageous conduct." Because a jury should decide whether the force used was excessive, it should also decide whether that conduct was extreme and outrageous under the circumstances.[5]

### B. Wexford Defendants

The individual Wexford Defendants have also moved for summary judgment on Thompson's IIED claims. Viewed in a light most favorable to Thompson, no

---

[5] Thompson has also named Charles Truitt as a Defendant, in his official capacity as Stateville's Acting Warden. As to the Acting Warden, Thomspon seeks injunctive relief in the form of "necessary medical care for his right hip and groin pain and any medical conditions attributed to this delay." [Dkt. 142 at ¶ 45(a); Dkt. 202 at 14.] Adding Truitt in his official capacity was appropriate here because Thompson sought injunctive relief. *See Gonzalez v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). To the extent that Truitt "would be responsible for ensuring that any injunctive relief is carried out" as to Thompson's surviving claims, Truitt remains a named defendant in his official capacity. *Id.*

12

reasonable jury could find that any of medical providers' conduct rose to the level of extreme and outrageous.[6]

As to the first factor courts should consider when evaluating whether conduct is extreme and outrageous, undoubtedly, there was an imbalance of power between Thompson and each of his medical providers given his incarceration. But this circumstance alone is not enough to make conduct extreme and outrageous. *Jose-Nicolas v. Wexford Health Sources, Inc.*, 2024 WL 3251368, at \*8 (N.D. Ill. July 1, 2024).

As to the second factor, "greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff." *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001). The Court separately evaluates the conduct of each of the Wexford Defendants below but reaches the same conclusion for all.

*Dr. Obaisi.*[7] When Thompson discussed his hip pain with Dr. Obaisi in February 2017, Dr. Obaisi performed a steroid injection to decrease inflammation and pain. [Dkt. 198 at¶ 25.] Thompson maintains he wrote a letter to Dr. Obaisi in March 2017 saying the shot had not helped with the pain and that more needed to be done "to figure out what was wrong with his hip/groin area." [Dkt. 212, ¶11.] But it

---

[6] Thompson's Third Amended Complaint names Wexford as an individual defendant but does not allege any specific facts as to Wexford. [Dkt. 142.] Finding Wexford liable under *respondeat superior* would require finding that a Wexford employee had committed an underlying tort. *See Gaston v. Ghosh*, 920 F.3d 493, 495 (7th Cir. 2019). Because no Wexford employee is liable for the reasons discussed, the Court finds no IIED liability as to Wexford either.

[7] The Court assumes, without deciding, that Thompson's IIED claim against Dr. Obaisi is not barred by the two-year statute of limitations.

13

is undisputed that Dr. Obaisi saw Thompson again in April 2017 with complaints of testicular pain. Dr. Obaisi recommended referring Thompson out of the prison for treatment. [Dkt. 198 at ¶¶ 28, 29.] These actions evince a legitimate attempt to treat Thompson and his pain on more than one occasion. It certainly does not elicit an "Outrageous!" response.

*Dr. Okezie.* Thompson maintains he wrote a letter to Dr. Okezie in March 2018 "regarding a recent appointment for the pain he was experiencing in his hip/groin area." [Dkt. 216, ¶14.] Though it is disputed whether Dr. Okezie ever received this letter, the Court assumes for current purposes that it was received. It is undisputed that Thompson saw Dr. Okezie for a medical visit in August 2018 to address Thompson's right hip and groin pain. [Dkt. 198 at ¶ 32.] Post evaluation, Dr. Okezie's "assessment was right hip pain and bilateral groin rash." [*Id.*] The plan of care included Mycolog ointment for the groin for thirty days. [*Id.*] A few weeks later, Dr. Okezie saw Thompson again and referred him to UIC orthopedics for a consultation "given the length of the complaints for right hip pain." [*Id.* at ¶ 33.] No reasonable juror could conclude from this evidence that Dr. Okezie's actions were outrageous or extreme. His decision to treat his pain topically and later refer Thompson to UIC reflects medical treatment "in *some* capacity [with] *some* steps to treat his medical ailments." *Hardy*, 2013 WL 5325077, at *6.

*Dr. Henze.* Between 2018 and 2020, Thompson saw Dr. Henze several times for treatment of his hip pain and to discuss her treatment decisions. Thompson maintains he wrote a letter about his hip pain dated September 29, 2018 as a follow-

14

up to a visit with Dr. Henze. [Dkt. 212 at ¶ 16.] Although Wexford disputes whether the letter was sent and maintains that Dr. Henze only first saw Thompson on October 12, 2018, *see* Dkt. 198 at ¶ 35, the Court again assumes for current purposes the letter was received. Still, the record reflects ongoing treatment by Dr. Henze tailored to Thompson's complaints. During the six-month period following Thompson's first visit with Dr. Henze in October 2018, she prescribed medications, and issued a low bunk permit, a waist chain, and an egg crate mattress to address his continuous hip and shoulder pain. [Dkt. 198 at ¶¶ 35, 38, 40.] After UIC orthopedics recommended hip surgery, Dr. Henze met with Thompson and prescribed post-surgery physical therapy, an MRI, a low bunk permit and low gallery permit, and renewed his pain medication. [*Id.* at ¶ 46.] She consulted with him after the surgery and called his mother to give her an update. [*Id.* at ¶¶ 49, 50.] Nothing about these actions evinces intent to cause emotional distress or knowledge that the actions would cause severe emotional distress, and no reasonable jury could conclude otherwise.

*Williams*. Thompson had the longest patient-provider relationship with Williams, who first saw Thompson in the fall of 2011. [*Id.* at ¶ 17.] Thompson claims to have written a letter to Williams about his hip pain in 2015, but Wexford disputes whether this letter was received. [Dkt. 212 at ¶ 6.] Assuming that it was received, over the next few years, Williams continued treating Thompson's ailments each time she saw him. For example, when Thompson told Williams about his hip pain in 2017, including describing considerable pain in his right hip area that had increased since the injection, Williams recommended that he see the medical director about it. [*Id.* at

15

¶ 27.] Thompson admits that when he told Williams the pain medication he was using was not working, she prescribed something else. [*Id.* at ¶ 44.] Like the others, she provided medical treatment in some capacity, including with steps to treat Thompson's pain and discomfort.

\* \* \*

This case is unlike those Thompson cites, like *Awalt v. Marketti*, 74 F. Supp. 3d 909 (N.D. Ill. 2014). There, factual disputes precluded summary judgment on plaintiff's deliberate indifference claim also prevented summary judgment on the IIED claim. *Id.* at 942. More importantly, the evidence in *Awalt* involved defendants who knew the plaintiff was suffering seizures and ignored the suffering, and who "knew there was a high probability that ignoring a seizure would cause severe emotional distress." *Id.*; *accord Cobige v. City of Chicago*, 752 F.Supp.2d 860, 871 (N.D. Ill. 2010) (plaintiff was susceptible to emotional distress based on defendants' ignoring repeated requests for medical treatment and denying routine medical care related to severe abdominal pain.)

The undisputed facts here are not nearly as extreme as these cases. It is true that Thompson requested an MRI for his hip pain over a lengthy period, but it is hardly the case that his complaints went unaddressed or were ignored. He received a steroid injection, pain medication, multiple internal medical evaluations, Mycolog ointment, an x-ray, new pain medication, a variety of medical permits, and a referral to UIC orthopedics for a hip evaluation. Each provider "treated [Thompson] in some capacity on various occasions"—a far cry from cases involving defendants who "'did

16

nothing' in the face of obvious signs and symptoms that [plaintiff] was suffering from a severe medical ailment." *Hardy v. Hardy*, 2013 WL 5325077, at *7 (N.D. Ill. Sept. 20, 2013) (citing *Cobige*, 752 F.Supp.2d at 871.) In short, the evidence presented here does not allow a reasonable fact finder to conclude that the medical providers had objectives in mind that were "inconsistent with, or contrary to, [a] desire to properly treat" Thomspon. *Hardy*, 2013 WL 5325077, at *7; *Jose-Nicolas*, 2024 WL 3251368, at *8 (granting summary judgment on an IIED claim because defendants consistently provided "some form of treatment to Jose-Nicolas, and because he points to no evidence of dislike, toxicity in their relationship, or other course of conduct that a reasonable jury could determine goes 'beyond all possible bounds of decency.'")[8]

For completeness, the Court also addresses the third consideration. There is no evidence from which to conclude that any provider was aware Thompson was "peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity." *Franciski*, 338 F.3d at 769 (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). Thompson argues his susceptibility was "due to his repeated calls for an MRI on his right hip over a nine-year period," (*see* Dkt. 202 at 17), but this is akin to emotional distress that stemmed not from the Defendants'

---

[8] Even if sovereign immunity did not bar Thompson's claims against Officers Scott and Pronger, no reasonable jury could find that Thompson's allegation against them rose to the level of IIED. Thompson alleges that the officers threatened to move him when he asked about moving to a lower gallery, but this falls far short of the showing necessary for the "extreme and outrageous" requirement. It is undisputed that these Officers had no discretion over gallery, cell, or bunk assignments, and neither had any involvement in dispensing medical care to inmates. [Dkt. 199 at ¶¶ 13, 19, 20.] On this record, no reasonable fact finder could conclude that their collective statements in response to Thomspon's inquiry went "beyond all possible bounds of decency, [as] to be regarded as intolerable in a civilized community." *See Swearnigen-El*, 602 F.3d at 864.

17

conduct but rather from the fact of his predicament. *Estate of Gomes v. County of Lake*, 178 F. Supp. 3d 687, 702 (N.D. Ill. 2016). Even viewed in a light most favorable to Thompson, summary judgment on the IIED claims is proper as to the Wexford Defendants.

## IV. Conclusion

For the foregoing reasons, The IDOC Defendants' motion for summary judgment is granted in part and denied in part. The Wexford Defendants' motion for summary judgment is granted.

Enter: 20-cv-1191
Date: November 19, 2024

_____
Lindsay C. Jenkins
United States District Judge